May it please the Court, good morning. My name is Tom Melsheimer on behalf of Rembrandt. This Court in a prior appeal set aside a judgment in order to new trial under Rule 60. It did so because it found that this was one of those rare cases where the professional and academic fraud and concealment of an expert hired by one party so tainted the trial that Rembrandt was denied a fair trial. Upon remand for that new trial, the District Court prohibited Rembrandt from using the very evidence, the concealed evidence that this Court had concluded justified a new trial. Isn't it true that the Court discussed that at length and said nobody is going to mention that expert's testimony? Your Honor, it's true that the Court said that no side could mention it, but of course that's part of the problem is that if you're talking about the District Court, in this case, part of the challenge was is we weren't trying, Your Honor, to recreate everything that had happened with the fraud. We weren't trying to recreate that the man had lied on the stand or anything of that nature. Sure, you just wanted to have your expert say, oh, we now think that his theory makes sense because we think it supports us, right? So you wanted to be able to have your expert talk about it. We wanted to be able to have our expert talk about the data that he did not have before when he... You're wrong, but when I looked through the transcript and I saw the back and forth with the judge on that very point, it seemed to me that you had conceded once you heard that J&J was not going to rely on that expert's testimony. It seems to me as if you said, okay, that's fine then, and you withdrew this objection, or at least it wasn't clear to me that you maintained your position that this was a problem for you. Respectfully, Your Honor, I think we did maintain it. I acknowledge that colloquy with the Court, but here's how we maintained it repeatedly. One, we submitted to the Court our assessment that the new trial should be based on the old record and the Rule 60 record. That's what we told the Court, which would have included this data. We also submitted a supplemental expert report of Dr. Beebe where he laid out in detail his desire to use this information and how he would use it. Your Honor, that expert report is in the record at 12759, so it is not the case... Now, it's true, Your Honor, there was that colloquy with the Court when it looked like he was going to exclude it in its entirety, but we submitted and pushed for Dr. Beebe to be able to rely on this data. Now, we don't contend, Your Honor, that this Court's prior opinion absolutely compelled the district court to admit that evidence. But we do contend that the exclusion of that evidence under these circumstances was not based on the analysis required by the law, was an abuse of discretion, and it prevented Rembrandt from getting the fair trial in which it was entitled. Two of the claim issues... Can I make sure I just understand the timing on something? I just don't know the answer. Yes, Your Honor. You had this colloquy with the Court where you appeared to acquiesce in the idea that no one was going to be able to refer to this evidence. And then you said, yes, but we should have put the Court on notice by virtue of our... Was it your expert report? What are the documents that you say should have put the Court on notice that you are continuing to contest whether you could utilize this evidence? What was that evidence? It is 12759, Your Honor, which is the expert report of Dr. Beebe, which was the subject... Was that expert report submitted before or after the colloquy? After, Your Honor. I believe it was submitted afterwards. I believe that was an earlier pre-trial. I can check the record on that. We had an earlier pre-trial where we talked about things generally. The Court ordered there could be some additional discovery. And I believe that what took place was we submitted a supplemental report because at the very earliest pre-trial, when the case was sent back on remand, there was all kinds of discussion about what was going to be allowed or permitted. And again, our statement then was only really related to the notion that we weren't trying to get in every possible thing that we might get in with respect to Dr. Bilowski. But we absolutely sought to introduce the testimony upon which Dr. Beebe wanted to rely. So there's... You directed me to 12759, but that's page one, the cover sheet of his expert report. What part of the expert report in particular, because it's definitely not that page since it almost says his name. So what part of the expert report in particular is it that you think absolutely puts the Court on notice that you had not, contrary to your discussion directly with the judge, you had not acquiesced? Your Honor, it would be 12783 and 12784, paragraphs 75 and 76 of Dr. Beebe's proposed supplemental report. The data concealed from the first trial, as this Court noted in its prior opinion, was testing done on behalf of J&J in connection with this very lawsuit of lenses sold by Bausch and Lyon. I don't see anything in 75 that satisfies what you're talking about. So what precisely, what sentence? Tell me out loud, please, the sentences and help me understand how these put everybody involved on notice that you were basically taking back your earlier acquiescence. Let me, I don't know if I can reduce it to a single sentence, Your Honor. 75 sort of talks about the study, but let me take you to 76. He says, JJVC's depth profiling experiments further validate my service analysis methodology presented in my 3 October 2011 expert report. And what is it that he excluded that you think is a problem? The depth, did he exclude the depth profiling experiments? He did not allow Dr. Beebe to look at the concealed data and say basically this. Wait, no, what you mentioned in this thing is their depth profile experiments validate his analysis methodology. Did he exclude any discussion of the depth profiling? He did, Your Honor. He absolutely did. So this expert couldn't then testify about how those depth profiling experiments did in fact support his methodology? He was not permitted to do that. That is correct, Your Honor. And just to clarify, this was depth profiling analysis that he had done of the C Division Bausch and Laum lenses. They, which were agreed to have the infringing surface layer. And he was going to use that to say this has the same profile that I found in the J and J lenses in terms of the data. And he was not allowed to do that. And the fact of the matter is that was independent corroboration of his overall testimony. And one of their big attacks, which they spent a lot of time in their brief talking about, is they attacked Dr. Beebe's use of something called cryomicrotomy. This data was independent of cryomicrotomy. In other words, they were free to attack his use of that technique and say he didn't do it right or it was misleading or whatever. But if he'd been allowed to rely on this data, which had been concealed from him, he would have been able to say independent of my cryomicrotomy analysis, I also have data from J and J's own retained expert that supports my conclusion. Do I remember correctly that the reason why the district court didn't allow your expert to rely on this methodology is because previously your expert had said that this methodology was erroneous and not reliable? There were two reasons, Your Honor. That was one of them. One of the reasons was that he said that Dr. Beebe had somehow flip-flopped. I challenge that for two reasons. First, he testified about this methodology in the first trial. It's not like it had never come up before. He was critical of the way it was done, but of course he didn't have access to the concealed data. It's not fair to hold up that criticism of the study and then say, well, now that you have something that wasn't revealed to you before, you're stuck with your old criticisms. That's point one. So you see that as an abuse of discretion? Yes, and point two, Your Honor, Dr. Beebe testified that in the interim between the first trial and the second trial was about five years, and he testified that he had learned more about the procedure. I don't believe that's an appropriate – the court couched it as a Daubert ruling. I don't think that's an appropriate Daubert ruling because if in fact he'd said something different, he could have been subject to cross-examination on it. Because this whole sputtering technique was introduced without real challenge in the first trial. There was no Daubert challenge in the first trial about this methodology when J&J tried to introduce it and did introduce it. So this is not some sort of junk science question. He was critical of it. He didn't have the full picture. Once he had the full picture in the intervening five years, he said, you know what? This data actually shows me something that is useful, and it confirms my own view. And, Your Honors, it was important especially because the linchpin of their defense in this case was that their lens was different from the Bausch & Lomb and Seba lenses. The whole trial was filled with the notion that those lenses were so different because they were coded. But this concealed data, which related to the Bausch & Lomb and Seba vision lenses, actually would have allowed Dr. Beebe to challenge that and say, no, that's not right. In fact, they have the same kind of profile. So the other reason, Your Honor, just to follow up on my previous answer, the other reason that he excluded Dr. Beebe from relying on this concealed data was he said it was beyond his portfolio. It was gone beyond his original brief, so to speak. That's just plainly incorrect. He didn't do that kind of testing. He did TOF-SIMS testing, so-called conventional TOF-SIMS. The testing that was at issue here was this soft sputtering TOF-SIMS. But it wasn't beyond what he talked about. He had talked about that information in the first trial. But was it beyond his expertise? Your Honor, it was not beyond his expertise. He was very familiar with TOF-SIMS. He was willing to criticize the Bielowski data, which was incomplete, and he was willing to say he wouldn't have done it himself quite that way. But once he saw the data that had been concealed from him, he said, you know, and five years intervening, he was willing to say, look, now this shows that my original analysis was correct. Wait a minute. He also testified the underlying data was based on a technique that was not available when it was allegedly performed. And he also testified the whole experiment was poorly designed and he wouldn't rely on it. So I'm supposed to conclude the district court abused his discretion in finding Dr. Beebe's reasons for switching his testimony unpersuasive when none of your current arguments seem to go to those points. I respectfully disagree, Your Honor, for this reason. I think it is very unfair to hold Dr. Beebe to every word he said before on what was available to him when the expert had deliberately concealed unfavorable data. So, yes, he was critical of that expert and some of the methodologies, but he was looking at an incomplete picture, a picture so incomplete that this court concluded that it so tainted the original trial that it required a new trial. I'm going to yield the balance of my time for rebuttal if that's appropriate. Thank you. Mr. Discant. Thank you, ma'am. Please, the court. I'm Greg Discant on behalf of Johnson & Johnson VisionCare, and I'll focus on the issue that counsel just addressed. Before I do, the court remanded the case with direction to give Rembrandt a chance to develop the case as it saw fit with all the facts in front of it, and the district court completely permitted them to do it. They proposed new expert reports. The district court agreed with that. They proposed depots of the new expert reports. The district court agreed with that. They proposed... Both sides have new experts or new experts in addition to previous experts? They proposed that there be no new experts and no new testing, and we agreed with that with one exception. Obviously, we weren't going to call Dr. Balowski again. We substituted, however, Dr. Bradley, who had been disclosed in the initial case, had put in an expert report in the initial case, had been deposed in the initial case, so it entailed no new discovery. We just had a fully disclosed expert. Beyond that, on their demand, basically, there were no new experts and no new testing. So we were limited to what the remand order suggested, and Judge Corrigan allowed them fully to develop all that they wished. On this subject of the, I call it the sputtering data, it's also the depth profiling data from the University of Texas, this court, that data was incomplete and not fully documented. This court suggested that Rembrandt take depositions of the people who had done the experiments so they really would understand what they were about. They chose not to do that for whatever reason. They don't know. What exactly was Dr. Bisbee troubled with with respect to the sputtering test? Dr. Beebe? Dr. Beebe. Okay. Now, was it the results or was it the methodology itself? It was the methodology itself. He testified that it didn't matter what the underlying data was or anything. It's the methodology that he disputed. He absolutely said the methodology was inappropriate and unreliable, and he repeated that. After the Rembrandt? Yes. That's the thing. The thing I was quoting from on 1377, I went back, look, that's post-Rembrandt. That's just the recent testimony. After the Rembrandt, he said it was, he actually said, after the Rembrandt, he said the right equipment to do that experiment did not exist in 2012, but now we wanted to rely upon it because he learned more stuff. We said, what? He couldn't identify it in his deposition. In their reply brief on our Daubert motion on this, they said, well, there are these two. I can't figure out why he wanted to rely on it because he went on to say how bad it was. He wanted to rely upon it, the judge said. Now I think it's, you know, I used to think it's terrible. Now I think it's great. He wanted to rely upon it because he wanted to do a know-nothing analysis of it, and that was the second reason it was excluded. It was excluded both because of his flip-flop, but the other reason it was excluded is in this sputtering technique, the beam goes into the polymer and sputters. The first 5 to 10 nanometers are unreliable data until the beam settles down. He wanted to, and in his earlier testimony, he acknowledged that the early, the initial few nanometers of data are unreliable and cannot be relied upon. In the expert report that he submitted supplementally, he ignored the transient region. And so basically it was junk science, and, you know, you could just look at Judge Corrigan's decision excluding it. It's on 4 and 5 of the appendix. First he talks about his flip-flop, which is an independent reason under 11th Circuit law, and then he says at the end, the court finds Dr. Beebe's reasons for altering his prior opinion unpersuasive and, this is the transient region point, excuse me, the manner in which he proposes to use that testing is inappropriate under Daubert. This is meaningless data. We made both points in our Daubert. Either one was sufficient to exclude the data. It was not an abuse of discretion. One of the questions that we had asked was the relative timing of the discussion before the judge in the flip-flop position versus the timing of the updated expert report. And I understood from counsel that the colloquy occurred before the expert report, but I think I'm not sure that that's correct. You agree? Yeah. That was the initial conference, and we had this discussion. Excuse me. He may have said, the judge may have from time to time said, I don't want to hear about Pulaski's name, and everyone agreed with that. So possibly you're looking at something from later. But it was never a surprise to us that they were going to do this. It was in his expert report. We made a Daubert on it. The judge excluded it properly for the two reasons I identified, and there was no gamesmanship on that issue. So I agree with Ms. Penalty. Thank you. I'm happy to address any other issues that are on the court's mind, but basically we tried a fair case. Judge Corrigan granted some motions that they made and granted some motions that we made. They say he had prejudged the issues. Boy, we were hoping he would just reinstate his Daubert, excluding the sure D testing and grant us a summary judgment without trial, and he denied that. He let them go to trial. They lost fair and square, and this court should affirm the judgment. Okay. Thank you, Mr. Diskin. Thank you. Mr. Nelson, you have some rebuttal time left. You may please support. Just to put a button on Judge Stoll's question, the conference with the colloquy that you've mentioned was, I think, at 131, November 8, 2016. The expert report, in any event, was January 20, 2017. I don't think there's a dispute that whatever that colloquy meant at the time, we certainly were trying to push to have him be able to rely on this data. Just so you know, the part that I was looking at is on page appendix 33, and it's from a July 27, 2017 hearing. That's what I was looking at. Your Honor, I don't know if the court had ruled at that point on Dr. Beebe's report coming in. It may have been that at that point he had said it's not coming in, but it was pretty clear, and I don't think there's really a dispute about this, that we put this in his expert report. He was deposed about it. He gave a clear intention of what he was intending to testify about. They moved to strike it under Dobear, and the court granted and said we couldn't talk about it and said we could not talk about the concealed data. It was never our position that we had agreed to that. If we had agreed to it, we wouldn't have pushed so hard to have Dr. Beebe talk about it. I certainly understand the court's concern, as given from some of these questions, that Dr. Beebe was critical of the methodology. I think that is something that is fair game for cross-examination. It is, to me, a remarkable result that the data, the concealed data, that caused this court to grant a new trial could not be used topside or bottom by our expert in the new trial at all. We weren't asking to put in all the evidence we could have put in. Perhaps it's because that data is a result of methodology that your expert said was fault and defective, and it's kind of like an axiom that all defective methodology is going to produce tainted data. I think, Your Honor, that in fairness to Dr. Beebe, he made those assessments, at least initially, without exposure to the concealed information. And the fact is, whatever he said later, he said in his expert report and intended to say in the trial, that this information was corroborative. Because if it was worthless junk science, then the concealment of it shouldn't have prompted this court to do the extraordinary remedy of a new trial. So our position is that he should have been allowed to rely on that. I haven't dealt with the modulus information. That's pretty well briefed. We don't believe that we got the fair trial to which we're entitled. I know this court is, if no doubt, finds unappealing the idea of having this retried a third time. This court has, in fact, done that before in the Commel case and other cases. And to me, it's not a question of whether this case has been tried three times or 30 times. The question is, has it been fairly tried with all the evidence available to us? We don't think it was. And that's why we think this court should reverse. Thank you very much. I thank both counsel. The case is taken under submission.